The case for this morning is Alexander v. Ingram Barge Company. Mr. Brennan. Good morning, Your Honors. May it please the Court, my name is Kenneth Brennan. I represent the flood claimants on this appeal. This appeal involves a number of academically interesting issues regarding federal maritime regulations, legal presumptions, shifting burdens, and the movement of water. And I'm going to address all of that during my argument. I want to make the point at the outset that to my clients, my 200-plus clients, this case is very personal. As a result of the elision, their riverside town was devastated. Their homes were either completely destroyed or damaged, as was their personal property. And their lives have been gone through upheaval as a result of the incident. So I wanted the Court to just have that in mind as we proceed. Ten hours before the elision, Ingram's Captain White, who was the captain of Ingram's vessel, told his shoreside manager that he was concerned he might have to cut the barge's loops. Can I just ask you this question, just as a preliminary thing? You begin your brief by saying few, if any, facts remain subject to dispute. We, of course, have an exhaustive, I'm not going to say exhausting, but an exhaustive district court opinion going through the facts. The district court concludes, obviously, in the end, that it's the lockmaster, Rodriguez, who is exclusively responsible, solely responsible for the flood. And that sounds like a finding of fact to me. And so I'm not sure whether you're arguing that it's clearly erroneous or how you get around the facts that are found. What are we supposed to do with these facts? I think the facts throughout the opinion, many facts in the opinion, demonstrate that Ingram was also negligent. The flood claimants are not disputing that Rodriguez was negligent. No, I understand. I understand. The focus is on whether it's exclusively Rodriguez or whether there is some contribution, even a very small contribution, from Captain White or Ingram Barge or the Lloyd Murphy people or any of these other candidates. Okay. Well, I guess to answer the question, based on the record, yes, the finding of sole proximate cause was clearly erroneous. And I understand it's a difficult hill to climb on a bench trial to obtain a reversal. But I think that the facts of this case and the governing law establish that to be the case. And I want to fully answer your question. I'm not sure that I am. But what I want to demonstrate is that the district court's opinion, which was thorough and which was, in many respects, many findings of fact, correct. But the district court's opinion, conclusion that Rodriguez, the Army Corps' lockmaster, was the sole proximate cause of the elision was based on legal errors and errors in application of the facts to the law with respect to regulatory violations. Okay. So these are your three rules, your rules that you're talking about here, the navigation rules? Yes. That's exactly right. So, yeah, I mean, I guess you're obviously free to talk about them. I'm not sure. Is it possible for you to tell me just in a sentence or two what you think, just to take one person, Captain White should have done that he didn't do? Yes, Captain White should have posted for, well, let me start with the lookout rule. Captain White should have had a lookout somewhere. There was no lookout. Why would that have made any difference? What action would he have taken or not taken based on the lookout saying, wow, I really see a lot of outdraft or, you know, he's already so far down, he's already hugging the left side of the river at this point. When is the lookout supposed to be there, when he leaves Ballard Island? The lookout should have been there from the moment that the vessel left Ballard Island. The meaningful violation of the lookout rule, that is to say, the lookout rule violation that gave rise to a cause of the elision occurred after Rodriguez, pretty early in the voyage, diverted from the plan. Okay. So the lookout, the rule is very clear. There's no higher duty than to have a lookout. And he says he's his own lookout. I mean, the district court finds that he's enough of a lookout. Okay. I want to address that because I think that is a key finding, and I think that is absolutely, clearly erroneous. The law is plain based on not only the legislative history, but Ingram's own expert who said that for a helmsman, the guy behind the wheel, Captain White in this case, to be an adequate lookout, he must have an unobstructed 360 degree view. He did not. He admitted he did not. In his testimony, and we cite this in the brief, he says, no, I had these cover top barges. So there was a blind spot in front of me. Is he behind the barges or is he in front of the barges? Behind the barges. He's behind the barges. The barges are in front of him, and your view is that he can't see what's going to be off to basically his right side, where the dam is. Is that right? Where the outdraft is going to be pulling from the canal. Right, well, he's going down, so I'm thinking of these pictures that are in your opponent's brief. You know, you've got this side canal that's off, you know, going down river to your left, and you've got those little pylons or whatever they are, the little dots. Right. And the dam is off to the right, basically, and the cross current, the outdraft is perpendicular to the way the boat's going, right? The barges are going. Yeah, that's accurate. Now, in my reply brief, Your Honor, and possibly my opening brief, but certainly in my reply brief, I quote Captain White's testimony, where he says that his vision was obstructed by the covertop barges. He specifically said, no, I could not see the outdraft until I was right up on top of it, which is to say until it was too late to make a call or do anything because of the covertop barges. And I would certainly call the Court's attention to that testimony because I think it's critical. Does the record show that there was a place somebody else would have had an unobstructed view? There would have been an unobstructed view from several of the other vessels or someone from… But his vessel, are you saying a lookout could be from a different vessel? Absolutely. This was a coordinated… No, I know it was, but I'm saying you interpret the lookout rule to say that you don't need a lookout on your boat as long as somebody else has a lookout on theirs. It's not exactly what I'm saying. What I'm saying here, Judge, is that you always have to have a lookout, period. Ingram did not have a lookout, period. Now, what Captain White said at trial was, look, I'm not going to put somebody in jeopardy on the front of my boat to keep a lookout. That was his reason for not posting a lookout. Is that reasonable? Maybe. I mean, probably, right? I don't know. But the peril was great for the lookout, but the peril was… I'm sorry. Go ahead. You're conceding, though, that he doesn't need to put someone's life at risk to post the lookout on the front barge? I don't want to say I'm… It seems to make sense to me that if there are other options that you shouldn't put somebody on the front of the barge if you really think he's going to die. But you do need a lookout, and there were plenty of opportunities for a lookout. There could have been a lookout on the shore, and I'll note to the court that the lockhouse where Rodriguez was, and this was where his location was, but this certainly wasn't his duty, there was a camera that was trained on the outdraft, and putting a lookout or assigning a lookout to look at the outdraft from that perspective would have been adequate. Then somebody would have seen the lookout. What you have here is you do not have an adequate lookout, period. And what's the excuse for that, that it was too dangerous to have a lookout, but it wasn't too dangerous to drive blind into this outdraft? Well, he didn't know the outdraft was going to be what it was until Rodriguez lifts the gates from 55 feet back up to 88, right? That's true. And my response to that is that the court found that Rodriguez agreed to lower the gates to 16 feet. To 16 feet, not by 16 feet. Correct. We're not challenging that, okay? There was evidence to support that finding, and so we're not challenging it on appeal. However, that doesn't exonerate, that's a poor word in this case, but that doesn't excuse Ingram from its lookout duty. And I don't want to really get into the rule too much other than to say it is unforgiving. It says all vessels using all means at all times. And the notion that, well, somebody told me that there wasn't going to be a serious outdraft does not give rise to a, does not eliminate that duty. That would be akin to if somebody told you that the light was going to be green as you're driving through an intersection, and you not only sort of don't look around before you go through the intersection, you don't even look at the light, okay? That's what happened here, and that's not reasonable. And if there is an exception to the lookout rule for, you know, third-party assurance that things will go perfectly and that you won't have an outdraft, I haven't seen it anywhere. I haven't seen any exception like that from any Supreme Court case. I haven't seen any exception like that from the Seventh Circuit or any district court. There is no exception. There had to be a lookout, and if there were a lookout, the burden of having a lookout was minimal. And I think this is important if you're talking about burdens and benefits, or if I'm talking about burdens. You've been saying that it isn't so minimal. You've suggested another boat. You've suggested the place where Rodriguez is located, the lockhouse. You've suggested putting a man out at the end. As I understand it, this is being pushed down a river that maybe some guy should be hanging out there on the end of the barge to see the outdraft. Or maybe you've suggested that they're communicating by radio. I'm not sure what you're suggesting. A lot of different things. Everyone was communicating. Well, no, I'm not suggesting a lot of different things. I'm suggesting a lot of options, any one of which would have been easy. If during this captain's meeting or during the IRCA call, somebody, Captain White, Penn Lavin, said, we need a lookout, okay, and we're not going to be able to see the outdraft because of these covered top barges until we're right on top of it, which it will be too late, you know, IMS, your boat's involved in this. Maybe you guys can keep a lookout on that. Let's put somebody up in the lockhouse. Any number of things could have been done, and there was radio communication among everybody, okay? So it would have been no problem. I do disagree strongly, Judge, with the notion that this would have been much of a burden. It was just ignored, okay? There wasn't a lookout, and if they had a lookout, they could have averted this disaster. What could they have done? Not started or changed direction or slowed down? What's your theory? Let me answer that two ways, okay? The first answer is this. Under the governing law, the Pennsylvania rule applies, okay, which shifts the burden. Once there's a regulatory violation. Right, you're right. If you have the violation, which the district court found you did not, but if you did. Yes. If there was a violation, then the Pennsylvania rule kicks in. And what the Pennsylvania rule says is that Ingram has to show that its violation could not have been a contributory cause. Again, very, I don't want to call it extreme, but very demanding language, right, that's from the Supreme Court. The Seventh Circuit has followed it. The Seventh Circuit has said the Pennsylvania rule needs to be applied strictly. And Ingram and the district court never once, never once demonstrated that failure to see the outdraft could not have averted this elision. Put that aside, though, because put that aside, and my second answer to your question is a simple transmission to Rodriguez to say, what are you doing? Lower the gates. And the record shows that that would have happened. He could have done that. He certainly could have lowered the gates. I mean, well, actually, this is sort of probably a trivial factual question. Is 55 feet as low as the gate ever got? We have the transmission that Captain White knows it's gone down. He thinks it's still going down, and this is an interim report. But do we know if they ever got lower than 55? That's not a trivial question. I'm pretty sure the answer is no. However, Mr. Haycraft will correct me if I'm wrong about that. And do we know from the record? I love this phrase, actually, a woe or go moment. Is there a point in this transit that once you had passed that point, there was simply no way to stop the transit? I'm not sure of the answer to that question, but I can tell you that it would have been very, very late in the process, long after the outdraft was a problem, long after Rodriguez diverted from the plan. So your thought is if you had spotted the outdraft, you could have just put on the brakes more or less? That's probably the wrong phrase. But you could have stopped in this raging river, you could have stopped the movement of the barges? You certainly could have probably slowed down momentarily. And if you couldn't, you could certainly call Rodriguez and say, lower those gates. It only takes four minutes to lower those gates. And there is evidence in the record, undisputed, that really just lowering the gates from where they were to 60 feet would have made an enormous difference and would have given the flotilla a much better chance to get through. So you don't have to get them all, ideally, get them all the way down to 16 feet. Necessary? No. They would have had a much better chance. And this is in the record. It's just bringing them down to 60 feet. And so I think hopefully that addresses your question. Yeah, that's helpful. I am already into rebuttal time. So if it's OK, I'll just sit down. You are free to save it for rebuttal. All right. Thank you. Sure, Your Honor. Mr. Haycraft. Good morning, and please support. I'm Don Haycraft. I represent Ingram Barge Company, the appellee, in this fact-bound, extremely fact-bound maritime case. I want to answer Judge Wood's two questions just toward the end there of Mr. Brennan's argument. Number one, Judge Wood asked, she thought she found in the record somewhere a mention of a go or no-go place as the 30-minute transit, which was one mile from Ballard's Island to the safe harbor of the Mars Sails Canal, one mile, 30-minute trip. And Captain Ice, the captain of the Lloyd Murphy, who was acting as an assist tug on the starboard side of the Dale Heller, the Ingram boat, mentioned on the radio, on the communications channel that all the boats were using, that there was a go, no-go place. And that was at precisely 5.15 p.m. Mr. Rodriguez, the lockmaster, began raising the gates instead of lowering them at between 5.18 and 5.20, in other words, three to five minutes after Captain Ice recited over the radio, hey, we've reached the go, no-go place. So Judge Wood, you're completely correct that by the time Mr. Rodriguez inexplicably and unjustifiably raised the gates to 88 feet, creating that tremendous outdraft, that the tow was committed, was inside those five dots that you referred to, which are actually fairly large protective piers in the water to help prevent vessels from being driven towards the dam. Now, logically, it seems to me that the strength of the outdraft would be a function of how high the gates were. Absolutely. So the outdraft wouldn't be as much when it was at 55 feet as when it was 88. And I'll take this opportunity, since you mentioned the 55 feet, that as it turns out, the lockmaster never got the gates even to 55 feet. He got to about 60 feet, and about the time the tow got to the critical and beyond the no-go place at 5.18 to 5.20, unjustifiably, and the reason the district court found as fact that the lockmaster was 100% at fault and the sole proximate cause of this event, unjustifiably at that point, beyond the go, no-go point, he raises the gates. Did he ever explain what prompted him to do that? In this trial, which was a 10-day trial, 18 witnesses, 33 depositions that the district court reviewed, and as you mentioned, exhaustive opinion, 127-page opinion, yes, that was Larry Rodriguez took the witness stand. I cross-examined lockmaster Larry Rodriguez. Both in his deposition and at trial, Mr. Rodriguez said this, I knew the town was not flooding. Yes, I had a good view of the river level on the right descending bank where the town of Marcelles is located. I had a gauge, a river gauge, that feeds to my monitor. I knew what the river level was, and I had no reason, based on my own judgment, based on my 27 years of experience as lockmaster at this particular location, I had no reason to raise the gates, but the Corps of Engineers man that the Corps insisted be the communicator with the lockmaster in the lockhouse, that man's name is Jeff Griffin. Griffin, right. Yeah, Jeff Griffin said, yada are words to the effect of raise some more gate, and Larry Rodriguez, as he said under oath on the witness stand, I took that as an order. Even though Jeff Griffin isn't a dam operator, in fact, is a crane supervisor for the Corps of Engineers on the Illinois River, and even though with my own instruments, pardon me, my own visualization of the river bank by surveillance camera, my own river gauge, I had another camera trained on the tow, so I knew exactly where the tow was in relation to those five protective piers that are close to the dam. I knew exactly where the tow was, and the tow wasn't yet in the outdraft area, and he explained after the fact to the Coast Guard and to his bosses at the Corps of Engineers, Mr. Rodriguez said, oh, I never promised to lower the gates to 16 feet. I said I would lower the gates by 16 feet. And so after this accident, this terrible accident, where truth be told, all the mariners on all the boats were probably at risk. Certainly the men, the 10 men on the Dale Heller were just very, very fortunate that when they turned in front of the dam, that they didn't flip, capsize right at that point, and all 10 men would have drowned. What I was getting at is that Larry Rodriguez had no good explanation. He said, I just was following orders. And so the district court found as fact that Mr. Rodriguez inexplicably and unjustifiably and in contradiction of the regulations, which put him as the operator of the dam, as the authority for manipulating those gates, it wasn't up to the mariners to tell them when or how. And in fact, Mr. Rodriguez in the IRCA call told the participants in the IRCA call, I will make the decision when to lower the gates and reduce the outdraft. So unless there's something flawed about that factual finding, the issue of the Pennsylvania rule burden shifting doesn't really make a difference here? Precisely. As I understand how that rule works? Correct. So even if there was a regulatory violation, her finding that he was the sole proximate cause resolves the case either way? That's correct, Your Honor. The district judge here found several things, any one of which would result in this court affirming the district court. Number one, there was no violation of the lookout rule, rule number five. Moreover, therefore, Ingram is exonerated. And number two, the district court found, well, even if I were to find a violation, say, of the lookout rule, the lookout rule through long jurisprudence has, although the burden shifts, if the ship owner shows that the violation could not have caused the accident, and then the burden shifting of the Pennsylvania rule is met, and then finally the lookout rule is, even if violated, if another party is the sole proximate cause, then the violator of the lookout rule is not held at fault. So three bases for the district court's opinion. And I want to get to the go-no-go point again because I think it's extremely important. We put in our brief an excerpt or a graphic because pictures can tell the story better than words many times, and in this particular case the district court. I liked your pictures, by the way, but which one are you talking about right now? It's on page 32 of my brief, the appellee's brief. It's at the bottom and it shows, I want to point out something about the lookout rule. If you saw this bigger, and I could have made it bigger, but you see the tow in front of the towboat, and you see at 527 it's parallel to the left ascending bank and headed right into the Marseilles Canal. To the right or to the starboard are those five protective piers and then the dam. At 527, and if you back up, that is from Trial Exhibit 85, and there was another trial exhibit that was called Trial Exhibit 88, which is a fascinating exhibit and it was shown several times in court. It's a visualization of the trip from Ballots Island to the accident site at 533 p.m. It shows the exact position of the tow minute by minute by minute. I've excerpted just the one at 527 there on that page, 527 p.m. on that page. Was that constructed from these various cameras that people had? Yes. The accident reconstructionist, Mr. Fitanto, testified, and Exhibit 88 is his visualization, which is constructed not just from all the dam cameras. This record also included transponders' signals from the various vessels and the United States Coast Guard's data, the exact second by second position of all the vessels in this flotilla, and the speed and everything. There was zero dispute over Trial Exhibit 85 or Trial Exhibit 88. At 518, for example, which is when Mr. Rodriguez began the process of raising the gates from 60 feet, not 55 feet, back up to 88 feet, that process was completed. That is, the gates got completely raised at 527. The reason for the picture being selected on page 32 is that at 527, they were well beyond the go, no go, or the point of no return, so to speak. As you can see, this tow is 1,000 feet. Well, you can't see it, but it's 1,000 feet long. I can see the scale. Yeah, the scale. The tow was absolutely committed. So there's no way to stop it at that point, I guess, in these river conditions? No. Could I? Yes. It seems to me, but I'm probably not right about this, but that the higher the gates are, the more the river is just flowing downstream, and the less the risk would be of flooding. I thought the reason they wanted to keep the gates as far down as 16 feet for just the shortest possible time is that the water did create a risk of flooding. Is that right? Yes. The dam gate's purpose year-round right now is to regulate the pool. The Illinois River is a series of locks and dams, and basically from Chicago down to the Mississippi River at Grafton, Illinois, you step down seven or eight steps. And so the Marcelles Pool is contained between this Marcelles Dam and the upriver dam, which is called the Dresden Island Dam. It's about a 26-mile stretch where the river level is kept constant by means of manipulation of the gates. And this extreme weather event that was taking place on April the 18th, 2013, this accident happens, as you know, at 5.33 p.m. on that late afternoon, this extreme weather event involved the lockmasters at the various dams on the Illinois River raising gates to keep water flowing downriver rather than build up. And away from the town. Exactly. So why does an elision then create flooding upstream? Well, Your Honor, procedural history is important here. Judge, the district court divided this case into three phases. This was phase one, the liability phase. The question of did the elision contribute to or cause any flooding would be phase two. So we don't even know. We're agnostic on that at this moment. I understand. And I just want to point out, because Mr. Brennan opened with his point about the 200 townspeople, his opening basically assumes phase two, which hadn't occurred yet. What phase one certainly pointed out was this was a record extreme weather event that was becoming more accelerated and more extreme as April the 18th progressed from dawn at 5 or 6 o'clock. And this IRCA plan created during the IRCA high water call, which was a Coast Guard industry core joint conference call to discuss, in general, the extreme weather event that was occurring that day and in particular that afternoon. And it was during that IRCA call involving the Coast Guard, the core, and river industry that the situation involving the Dale Heller tow or flotilla holding at Ballard's Island came to the forefront through Mr. Rodriguez, the lockmaster, who was participating in the IRCA call. I thought that Captains White and Ice decided at some point that staying at Ballard Island wasn't a feasible option. Is that right? That's right. The problem was as the river rose at an incredible rate during the day, means of holding the tow, including wires, led to the shore to the trees on Ballard's Island. About 1 or 1.30 that afternoon, one in the other tree gave way. They were able to maintain position using their horsepower. These were very large towboats, the Lloyd Murphy and the Ingram boat, but Dale Heller, 6,100 horsepower each. However, as the river rose and washed over the river banks upstream,  and what the risk was that afternoon was that one of those, and it's called drift in the briefs, this drift, which could be a tree, could get into the large propellers of these boats, jam into the propeller, stop the propellers, stop the engine from running, and then without control the flotilla would be swept into the dam and a catastrophic disaster. And so the IRCA call, this flotilla's in extremis situation, came to the forefront, and this plan, including Larry Rodriguez's participation plus Mr. Rodriguez's supervisors at headquarters at Rock Island and the Corps of Engineers, plus the U.S. Coast Guard Marine Safety Office, Captain Neubauer and his executive officer, Lieutenant Stacy Miller, plus port captains from Ingram and other river companies that operate big towboats on the Illinois River. The plan was, okay, the place for these boats to go, these tows to go, is into the still calm water of the Mar Sales Canal, and under the regulations, the lock master at the Mar Sales Lock and Dam, number one, controls and directs the movement of all vessels in and around this facility, including the dam. That's in the Code of Federal Regulations. Similarly, the lock master has to give permission, controls entry into this Mar Sales Canal. You just can't, as a mariner or a captain on a towboat on the Illinois River, you can't just on your own decide, I'm going to go into the Mar Sales Canal and park my tow there. You have to get permission from the lock master. Now, once they're in motion, is it still an option to just disconnect the barges and let them float off? Well, first of all, I'll quickly answer that. It's possible to go out with an axe and chop ropes and wires. That's a very rare and super extreme possibility. It was raining too, wasn't it? Wasn't it still raining? Well, it was raining buckets. The chief danger, though, was the swiftness of the current. So the downstream current is fast, and then you also have this outdraft. Yeah, well, the outdraft, as Your Honor pointed out early on, is down there by the dam where those five protected piers are. Well, and cutting loose the barges would create all kinds of other hazards, would it not? Well, cutting loose the barges was an option, but the IRCA call resulted in a plan that would not create havoc by cutting loose barges, which would then drift without any control by any boat downriver and possibly take out the whole dam. This accident certainly was a bad accident, but it would have been far worse to cut barges loose and let them drift with the current at current speed, which was estimated to be in the neighborhood of 8 to 10 miles per hour. This was an extremely dangerous situation. The IRCA call came up with this plan, the key elements of which were only two. That is, put the tow into the safe harbor of the canal, and in order to do that, the lockmaster, at the right time, will lower the gates to 16 feet, thereby reducing dramatically this situation. The downriver flow, right? Yeah, the captains were not going to go. The captains were not going to go. They would have done anything, including chopping the wires loose, rather than go down and face that outdraft and thereby put their men, their crewmen, at risk. And I want to say one thing on the lookout rule. Mr. Brennan neglects to mention, in response to Judge Wood's questions, that there were lookouts. Number one, the captain in the wheelhouse, Captain White, plus his pilot, Ron Schrader. But more importantly, this operation included having assist boats, three assist boats, one of which we've already discussed, the Lloyd Murphy near the stern or the rear part of the tow, pushing on the starboard or right side of the tow. Out at the head or front of the tow was the Creve Corps and the City of Ottawa. Those are two other assist boats. So a total of three assist boats were acting as the eyes and ears for Captain White. And we know they were in radio or some form of communication. Yes, they were all in radio contact, and Captain White could hear all the radio calls. Captain White, in the captains' meeting on the City of Ottawa, one of those two assist boats out at the head of the tow, Captain White and Captain Ice decided that Captain Ice would be the communicator with those three assist boats. Like, Creve Corps, you need to push here. City of Ottawa, you get on the head now. So that the whole tow, as it proceeded just that one mile, but very slowly at two miles per hour, could proceed safely, hugging the left descending bank. That's what you call river banks on all the rivers, including the Illinois. So that it could maintain a perfectly lined up position to head into that canal. And Captain White focused on keeping his tow absolutely perfectly lined up, going just the right speed. And then Captain Ice would say to the three assist, well, he was one of the three, the other two assist boats, do this, do that, do that. Captain White could listen to all that. My point is that, yes, not only was Captain White a lookout and an adequate lookout, but more importantly for this particular factual issue, Captain White had the benefit of the experienced captains on the Creve Corps and the City of Ottawa that were out at the front where Mr. Brennan posits with 20-20 hindsight that someone could see the water rushing past those protective piers and say something to the captain. It would be visible, though, right? I mean, an outdraft, I thought, to an experienced river person such as these people, would be visually identifiable, right? Visually identifiable because I think Mr. Brennan mentioned there's a dam camera. There's three dam cameras, one of which is camera number four, which Larry Rodriguez had a toggle in his lock house. He had the picture, and he could zoom and pan the camera view. Larry Rodriguez had a great view of the outdraft because we watched in the courtroom and the district judge watched in the courtroom. You could see him zooming in on one of those protective piers, and you literally can see a wake, sort of like the wake of a boat, coming perpendicular to the downriver current. The outdraft is sometimes called a cross current. It's perpendicular to the flow of the river. So it would appear like a slightly different color or something? I don't know. Perhaps more turbulent. And certainly the view from the dam camera four is looking from a different point of view. It's looking literally at the wake as opposed to being upriver, upstream, and to the left side of that pier. But the point is even had at 520, 521, 522, 523, had one of the captains on the city of Ottawa or the captain on the Creve Corset, Captain, the river is, you know, I'm not sure about this outdraft right here, which they didn't do. The point is that there was no going back. They were past the point of no return. They were committed to the maneuver, and unfortunately the lockmaster, without justification, had raised the gates and created this dangerous situation, and as the district court found, was the sole proximate cause. Well, and the lookout rule itself is stated in general terms, and so one of the alternative holdings, as I understand the district court's ruling, was that to prove a violation or to establish a violation before the burden would shift under the Pennsylvania rule would require some sort of expert testimony demonstrating what maritime custom would have required in this situation. Because the rule, I mean, it is a regulatory requirement, but like all of these regulatory requirements, it's stated in general terms, and a specific violation requires maritime expert testimony. Precisely, Judge, and in fact, the plaintiffs, or excuse me, the flood claimants' maritime expert, Captain Kinsey, gave no expert testimony on that very subject. Ingram's maritime expert, Captain Schropp, by contrast, did and said Captain White was in full compliance with inland navigation rule 5, the lookout rule. I see my time has expired. Do you have any other questions? We would ask that the district court be affirmed. All right. Thank you very much. Mr. Brennan, I'm sure you have something further. Thank you, Your Honors. I want to speak quickly because I have a lot to cover. I want to speak maybe for a couple of minutes on the lookout rule. Number one, Mr. Haycraft has admitted that the outdraft was visible and could be seen. There is no evidence in the record that anybody on any other assist vote was acting as a lookout for that outdraft. And the argument tends to completely take away any agency or responsibility that Captain White and his pilot Schrader had. Could I ask you why you said that? Because I thought when they had that captain's meeting and, you know, as they're trying to plan this, the risk of an outdraft was very much on everybody's mind. I mean, otherwise, you're just kind of, I guess, going downstream and maybe it's a heavy water, but it's the outdraft they're worried about, isn't it? That was the only reason that they were holding up at Ballard Drive. Yeah, so when you say nobody was looking for the outdraft, it seems strange. It seems troubling, but there is zero evidence that anyone looked at the outdraft. There was no discussion on the IRCA call of a lookout. There was no discussion in the captain's meeting of a lookout. There was no discussion. I mean, they didn't use that word. Pardon me? They did not use that word, but they did not go to that substance either, Your Honor. Wasn't that the whole point of the plan? You know, that's why we're going to stick to the left side of the bank. That's why we're going to try to have the gates down so that we can get it calm enough that we can navigate that last 200 feet or so, 200, 250 feet. That was the whole point of the plan, and I would submit to you, Your Honor, that the outdraft was roiling, was raging. Somebody's—so you're right. But it must have changed over time as the gate goes down to perhaps 60 feet or whatever it went down to, and then it goes back up again to 88. I guess the outdraft is a function of the dam, right? It absolutely is. It absolutely is, and Captain White had every reason to be concerned about that outdraft, and somebody should have been looking for it. I want to—I'm sorry, but I want to move to another point. Go ahead, yeah. Sole proximate cause. I think analytically that is the trickiest issue in the case because it stands to reason that if Rodriguez was the sole proximate cause of the elision, then nobody else could be a cause of the elision. I mean, isn't the real problem that if Rodriguez is the sole proximate cause, the United States has asserted its sovereign immunity from any damages resulting from this? Yes. If this court was to agree that Rodriguez was the sole proximate cause, yes, absolutely. That's it, okay. But the point I want to make is twofold. Number one, I think if you look at the term and the overall opinion of the district court, it's clear that the sole proximate cause finding was a function flowed from the finding that nobody else was at fault and that there were no regulatory violations. But number two, and I think more importantly, is this. I mentioned earlier that at some point in the transit, the absence of a lookout, and I would encourage the court to look at our discussion of the lookout because Captain White was not an adequate lookout. The meaningful violation occurred after Rodriguez's violation. So at five, what time were you talking about then? I would say roughly, I think, really, Rodriguez's violation occurred around 5-15, I think, where it was clear that he was diverting from the plan. As soon as he started diverting from the plan, that was the whole problem. He wasn't bringing the gates down. And the failure to have a lookout all of a sudden became very meaningful because nobody was looking at the outdraft, and that's clear. And so it makes no sense in this context on these facts to say that Rodriguez's fault somehow negates the notion that Ingram was at fault. But they're past the point of no return. They are not past the point of no return, and I'm glad you bring that up, Your Honor. I think the go, no-go spot is the point where they could abort the mission and simply stop. But there was nothing that prevented them from simply contacting the lockhouse and saying, lower the gates. And as I say, and it's in the brief, it was a finding of fact by the judge, the district court judge, that just getting it down to 60 feet could have made a real difference. So this notion that their options were to completely abort the mission, the transit, or alternatively just sort of go in blind and hope for the best. At what point on the clock do you maintain a proper lookout would have seen the dangerous outdraft? A proper lookout would have seen the dangerous, if the lookout, if they had stationed a lookout in the wheelhouse. Best case scenario, where should the lookout have been and at what point on that clock between 515 and 530 when the accident occurs would the lookout? I think probably before 515 because the gates never went down. But 515 is Rodriguez's negligence. Okay, okay. So at what point between 515 and 530 would a lookout in your best case scenario or required regulatory scenario, would a lookout have observed the dangerous outdraft in time to abort? Oh, I think they observed. And did you have any expert testimony on this point? Okay, I'm glad to bring that up too. But I think the answer to your first question is that the outdraft could have been observed the entire time, okay, either from the cameras in the wheelhouse. The testimony is universal that outdraft is just by definition present at any dam and lock on the river. So we're talking about the extreme outdraft that would have alerted any experienced mariner that this accident was about to occur. The extreme outdraft never really dissipated because the gates never got anywhere near 16 feet. Right, but the timing is important because if it was too late to do something that would have averted the accident, then Rodriguez is the sole proximate cause. Certainly by 515, one could have seen the outdraft and been concerned that we're getting closer and closer and this outdraft is still roiling, the gates are still going up. And in this context, I would ask the court, I won't have time to go through it, to look at the communications about the radio transmissions in Rule 7, which has to be looked at in this context along with these facts because the schrader was actually concerned that the plan wasn't being followed. Early on, a few minutes into the mission, and he said to Captain White, they just said they're going down to 55 feet. I thought they were going down to 15 feet. That's not quite a quote, but it's in my brief. And Captain White, who hadn't heard the earlier transmission that also raised some issues, said, oh, no, he's just telling us where he's going right now. And under Rule 7, the duty is if there's any doubt about a risk, you have to deem that there's a risk. So I think that you have to take those facts into consideration. With respect to expert testimony, A, there's no requirement. I don't think there's a case law that says there's a requirement for expert testimony on something like this. And B, we have expert testimony. We have expert testimony from Captain Shrupp, Ingram's navigation expert, who said without qualification that the person behind the wheel can be the lookout if he's got a 360 unobstructed view. Otherwise, the case law that I cited in my brief, and I cited quite a bit of it, saying typically the guy behind the wheel can't be the lookout. We heard how focused Captain White had to be on the ---- But you need maritime expert testimony on the causation question. The Shrupp testimony that you're referring to has to do with the regulatory violation that you're alleging. Okay. So what about the causation question? My response to that would be that Ingram, the burden switches to Ingram. Once you assume the regulatory violation, doesn't the burden switch to Ingram? Right, but if Rodriguez is the sole fault, nobody else is the proximate cause, then you lose either way regardless of the burden shifting. So you're talking about expert testimony on the causation question. I don't know how I could win if the court was to agree that Rodriguez was entirely at fault for the allegiance. Right. You've got to show that there was some other proximate cause or that there's evidence in the record, expert evidence in the record that there is another proximate cause. And I have to stop? No, you don't. No, you should answer the judge's question. Thank you. It's a good question. The answer is that, well, A, the answer is what I discussed earlier about the notion that the sole proximate cause that occurred before Ingram's meaningful negligence doesn't logically permit one to wash away Ingram's or to find that Ingram was not negligent. But I don't think there's any requirement for or I don't see that there's any requirement that we bring in an expert to say that under the facts of this case, I don't think we need to bring in an expert to say yes. And if somebody had seen this, then they could have made a phone call to the lockmaster. And I'll go again. I'll conclude just by reminding the court getting it gauged down to 60 feet would have been sufficient. And I, does that answer your question? All right. Thank you very much. Well, thank you for your time, Your Honors. I appreciate it. All right. Thanks to both counsel. We'll take the case under advisory.